**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190143-U

Order filed February 20, 2020
_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| GEOFF J. WALDSCHMIDT, | ) | Will County, Illinois. |
| | ) | |
| Petitioner-Appellee/Cross-Appellant, | ) | Appeal Nos. 3-19-0143 |
| | ) | 3-19-0462 |
| and | ) | Circuit No. 16-D-2225 |
| | ) | |
| TAMARA M. WALDSCHMIDT, | ) | |
| | ) | Honorable Kenneth L. Zelazo, |
| Respondent-Appellant/Cross-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice Lytton and Justice O'Brien concurred in the judgment.


**ORDER**

¶ 1      *Held*: The trial court did not err in its allocation of parental responsibilities and parenting time. The court also did not err when it struck Tamara's petition for contribution of attorney fees and costs.


¶ 2      Respondent, Tamara M. Waldschmidt, appeals a judgment allocating parental responsibilities and parenting time between her and petitioner, Geoff J. Waldschmidt. Tamara

contends that the trial court erred in its allocation determination. She also asserts that the trial court erred when it struck her petition for contribution of attorney fees and costs. We affirm.

¶ 3                                                      I. FACTS

¶ 4        The parties married in 1998. They have four children: A.W. (born in 1999), G.W. (born in 2001), K.S. (born in 2004), and N.W. (born in 2006).

¶ 5        On December 29, 2016, Geoff filed a petition for dissolution of marriage. Three of the four children were minors at the time of the filing (G.W., K.S., and N.W.).

¶ 6        Four days later, Tamara filed a petition for order of protection. The court granted the order of protection. Subsequently, the parties agreed to end the order of protection. The trial court appointed Juli Gumina as the guardian *ad litem* (GAL). The parties agreed to a "nesting" schedule in which the parties would split parenting time with the children at the marital home.

¶ 7        Next, Tamara filed a petition for the allocation of parental responsibilities regarding decision making and parenting time, a petition to appoint a custody evaluator, and a petition for allocation of the right of first refusal as to the minor children.

¶ 8        On November 6, 2017, the court entered a written order indicating that the parties had come to terms on an allocation judgment and Tamara would withdraw her request for a custody evaluator. The parties never reached an agreement.

¶ 9        On July 31, 2018, the GAL filed her report with the court. The GAL met with the children (together and individually) several times, met with Geoff and Tamara individually and together approximately 14 times, and visited the home 3 times. She also conducted telephone interviews with Tamara's counselors Kris Munson and Sister Linda Sevik, Tamara's sister Pam, the parties' marital counselor, the parties' neighbor, and the director of student services at the children's

school. The GAL also reviewed several video recordings, the parties' online family wizard (OFW) communications, all pleadings, and the children's educational documents and updates.

¶ 10     The GAL's report recited her findings as to the statutory factors and the best interests of the children. She found that the four children consistently expressed more trust and closeness with Geoff. The children also expressed more openness to communicate with Geoff. At the beginning of the GAL's appointment, the children were "amendable to an equal division of parenting time but by the GAL's last interview with the children, two of the remaining three minor children stated they wanted very limited time, if any, with [Tamara]." The GAL viewed several video recordings submitted by Geoff. In the videos, Tamara is yelling at A.W., G.W., or both if they refused to immediately complete a chore at her demand. The videos showed Tamara acting totally out of control and screaming profanity at the children. In one video, Tamara physically threatened one of the children. During the interviews, one of the minor children reported having increased stress and inability to complete homework because Tamara yelled all the time.

¶ 11     The GAL reported that G.W. started referring to Tamara by her first name as a sign of disrespect. Tamara believed that Geoff encouraged this behavior. The GAL did not believe Geoff encouraged the minor. G.W. reported that he felt disrespected by Tamara based on Tamara's threats to call the police on him, send him to military school, and her ineffective parenting methods. Like G.W., K.W. also lost trust in Tamara based on her belief that Tamara did not nurture her and attempted to divide the other children.

¶ 12     Tamara and A.W.'s relationship was the most dysfunctional. A.W. recently graduated high school and moved away to college. When A.W. left for college, Tamara immediately "dismantled" and "cleaned out" the entirety of A.W.'s room. The GAL acknowledged that A.W.'s room was a mess at the time but believed that Tamara's actions showed how "tone-deaf" she is to the children's

emotions. The GAL perceived Tamara's act as a message to the other children that "good [A.W.] is gone."

¶ 13    As to N.W., the GAL believed he was very close with his siblings. Unlike the other children, N.W. maintained an equilibrium between his parents. According to the GAL, "[t]he only time [she] saw [N.W.'s] exterior crumble was when [Tamara] brought him to [the GAL's] office for an individual meeting and the child was angry and tearful because he thought [the GAL] had lied to him about counseling and [K.M.'s] ability to watch him after school." The GAL believed that this situation was created by Tamara, not Geoff. The GAL noted that Tamara "worked very hard to create an appearance that she is doing everything for the children but her efforts are counter to the children's best interests."

¶ 14    The GAL believed the children were doing well in their school and community. However, she received information from the children that Tamara actively spoke negatively about the children to third parties such as relatives and neighbors. Specifically, the GAL was told that Tamara spoke negatively about Geoff and some of the children to her sister Pam.

¶ 15    As to the mental and physical health of the individuals involved, the GAL made the following notes. G.W. is diagnosed with Asperger's syndrome; a child with such a diagnosis has different social and emotional reactions. The GAL believed that Tamara lost her ability to be an effective and understanding parent to G.W. The GAL believed Tamara is "so focused on maintaining control that she loses sight as to how [G.W.] is wired." K.W was previously diagnosed with selective mutism.

¶ 16    Based on the GAL's conversation with the marital counselor, Tamara struggles with post-traumatic stress disorder due to past physical and sexual abuse she suffered as a child and young adult. The marriage counselor recommended that Tamara seek trauma treatment. However, instead

of listening and possibly investigating this further, Tamara accused the marriage counselor of malpractice, lack of skill, and lack of professionalism.

¶ 17    As to the ability of the parents to cooperate to make decisions, the GAL found that the parties have extremely different parenting styles which makes decision making difficult. The parents do not have the ability to make decisions together. During the divorce, there were several instances in which Tamara would become upset when the children would not do their chores. Tamara would go to Geoff for help. Geoff attempted to defuse the situation. Geoff's attempts were sometimes successful and other times, Tamara would become increasingly angered and accused Geoff of undermining her authority. The GAL perceived Tamara's parenting as completely ineffective and, at times, verbally abusive.

¶ 18    As to the level of decision making and course of conduct regarding decision making for the children, the GAL stated that during the marriage, Tamara acted as the primary "breadwinner" and primary caretaker of the family. Both parents are active in religion and the children participate in music and sports. Tamara also managed medical appointments without disagreement from Geoff.

¶ 19    As to the children's needs, the GAL found that K.W. and G.W. have withdrawn from interacting with Tamara. The children spend most of their time in their rooms when Tamara is home. When Geoff is home, the children are more likely to be together for meals, television, and socializing. All the children reported that Tamara (a dietician) failed to provide appropriate or adequate food. The GAL performed an unscheduled home visit and found that the freezer contained expired food. She also found rotten vegetables and molded food. She found it important that Tamara blamed Geoff on the lack of food but failed to address the children's complaints. During the same unannounced visit, the GAL found prepared food that Geoff had left for the

children. The GAL acknowledged that during the marriage, Tamara did not commonly prepare meals but during the divorce, Geoff listened to the children's complaints in an effort to "step up."

¶ 20    The GAL also reported that Tamara remained the parent that managed the children's schedules. However, she believed that Tamara used this as a tool against Geoff to argue with him over the OFW communication service. Throughout the case, Geoff made efforts to learn the children's schedules. The GAL believed that Geoff would be able to manage the children's schedules if the parties worked together.

¶ 21    As to whether there should be restrictions to either parents' decision making, the GAL learned of two instances of concern. The first involved the decision to allow G.W. to take a summer course online or in a classroom. Tamara insisted that G.W. take the class in person. Based on his conversations with G.W., Geoff disagreed. G.W. preferred to take the class online.

¶ 22    The second instance occurred with K.W., who had a 504 plan with her middle school to address her selective mutism. After reviewing the notes between the 504 meetings at the school and having a conversation with the school's director for student services, the GAL learned that Tamara portrayed K.W. as incapable of advocating for herself in a classroom. Tamara used an instance of K.W. "cutting" herself as a reason to keep K.W. on her 504 plan. However, Tamara failed to point out that this incident occurred nine months before the meeting with school officials. Tamara also failed to inform the school that K.W. previously attended counseling on the issue and it was determined that the incident was not a chronic situation that needed to be addressed. The director of student services noted that K.W. advocated "beautifully for herself as evidence that she no longer needed a 504 Plan."

¶ 23    After the first meeting, Geoff asked for a second meeting about K.W.'s 504 plan. At the second meeting, the school determined that K.W.'s 504 plan would end when she started high

school the next year. The GAL believed this showed that Geoff had the greater ability to listen and communicate with the children regarding their individual needs and interests. By contrast, the GAL perceived Tamara's actions as an attempt to maintain her control over the children as their primary caretaker.

¶ 24 Finally, the GAL commented on the order of protection Tamara obtained against Geoff. Tamara alleged that Geoff had sexually assaulted her two to three times a year during the marriage. The GAL did not believe these allegations were relevant to determine decision making or parenting time. Additionally, Geoff was never arrested, charged, or convicted of a crime.

¶ 25 As to the ultimate recommendations, the GAL found that Geoff should have responsibility to make decisions on education and religion with input from Tamara. As to medical and extracurricular activities, the GAL recommended joint decision making. As to parenting time, the GAL recommended allowing alternating weekends. Tamara to have weekday parenting time every Tuesday after school until the following morning and alternating Wednesdays after school until the next morning. The children would be with Geoff for all other times during the week.

¶ 26 After the GAL filed her report, Tamara filed an emergency motion to appoint a custody evaluator on August 21, 2018. Tamara alleged that the GAL was not qualified to make mental health determinations and could not make an adequate custody determination. Following a hearing on the motion, the court found Tamara's request untimely and that Tamara had ample opportunity to have a custody evaluation performed. The court found that it was in the best interests of the children to deny the additional evaluation.

¶ 27 The case proceeded to a 12-day trial. The GAL testified consistently with her report. Tamara extensively cross-examined the GAL. The GAL did not have a medical or psychology degree but, instead, was an attorney. She previously served as a GAL in several cases over the

prior 10 years. Tamara further cross-examined the GAL regarding several instances reported by the GAL.

¶ 28     As to the number of times she met with the parties and their children, the GAL believed that her report was accurate, but it may not be exact.

¶ 29     As to the unannounced home visit to investigate whether Tamara was providing for the children's dietary needs, the GAL communicated with Geoff so that she could find a time to make the unannounced visit. The GAL had heard from A.W. that K.M. had complained about not having food to eat. The GAL told Geoff not to inform Tamara of the unannounced visit.

¶ 30     When asked if she followed through by asking Tamara's sister and the neighbors to confirm the children's allegations that Tamara spoke poorly of the children, the GAL stated that she did not. The GAL believed that the neighbors were aligned with Tamara.

¶ 31     As to the reported instance of N.W. "crumbling" in her office, the GAL believed Tamara drove N.W. to her office. However, the GAL's billing statements indicated that Geoff, not Tamara, drove N.W.

¶ 32     When asked about the video recordings of Tamara yelling at her children, the GAL acknowledged that the videos were secretly recorded, and Tamara did not seem aware that a recording was being made. It seemed to the GAL that at least G.W. was aware of one of the recordings. The GAL never questioned Tamara about the recordings.

¶ 33     The GAL also spoke to the children to determine their wishes about parenting time. She met the children as a group initially. The GAL believed that the younger siblings may have been influenced by the older children. Ultimately, two of the three minor children indicated that they did not want parenting time with Tamara.

¶ 34 Regarding her review of the OFW communications between the parties, the GAL's billing records indicate that she spent two hours reading the messages. The GAL was unsure how many of the 2000 messages she reviewed.

¶ 35 As to the GAL's belief that Tamara used K.W.'s 504 plan against the children, the GAL believed that Tamara wanted the 504 plan to continue so that K.W. would not be allowed to babysit N.W. after school. This, according to the GAL, was because Tamara wanted to control the children as their primary caretaker.

¶ 36 Although not included in her report, the GAL was aware that Geoff had obtained a passport for G.W. without Tamara's knowledge. The GAL did not find this concerning.

¶ 37 Geoff testified at the hearing as follows. He acknowledged an incident that Tamara included in her petition for an order of protection. At the time, Geoff was sleeping in a different room; Tamara slept in the master bedroom. Geoff popped the lock to the master bedroom to get his personal items from the room. Geoff also acknowledged taking the spare keys to Tamara's car.

¶ 38 Geoff stated that he changed his and A.W.'s cellphone numbers without first informing Tamara. He did this because Tamara had disabled their phones from their existing service. Geoff believed that Tamara learned of this almost immediately after he obtained the new phone numbers.

¶ 39 Geoff denied Tamara's claim that he sexually assaulted her throughout their marriage. Geoff acknowledged one instance that Tamara raised in marriage counseling. When the couple was sleeping, Geoff awoke and reached his hand between Tamara's legs to initiate a sexual encounter. Tamara awoke and called Geoff by his name. Geoff interpreted this as her asking him to stop. Geoff stopped.

¶ 40 Tamara testified that she was a self-employed dietician. She admitted she would get frustrated with the children because she felt that they were disrespecting her, and Geoff was not

supporting her. According to Tamara, she was still attending therapy. She was diagnosed with PTSD related to trauma she suffered by clergy abuse when she was young. Tamara also claimed that Geoff sexually abused her two to three times per year throughout their marriage.

¶ 41    The parties closed trial proofs on December 6, 2018.

¶ 42    On January 25, 2019, Tamara filed a petition for final contribution to attorney fees and costs against Geoff. Geoff filed his petition for contribution to attorney fees and costs three days later.

¶ 43    At the February 7, 2019, hearing, the trial court struck the petitions as untimely.

¶ 44    On February 19, 2019, the trial court entered a written allocation judgment. It found that both parents were fit to perform parenting responsibilities, but the parties' respective faults make joint parenting unworkable. The trial court adopted the GAL's ultimate recommendations. The court allocated Geoff with sole decision making as to the minors' education and religion. The court allocated joint decision making as to medical decisions and extracurricular activities. The court designated Geoff as the primary caretaker. The court concurred with the GAL's recommended parenting time schedule. Finally, the court refused to allocate the right of first refusal.

¶ 45                                  II. ANALYSIS

¶ 46    On appeal, Tamara contends that the trial court erred in making its allocation of parental responsibilities and parenting time decision. Tamara also asserts that the trial court erred when it struck her petition for contribution to attorney fees and costs.

¶ 47                            A. Allocation Judgment

¶ 48    Tamara advances several arguments to attack the trial court's allocation decision. We will discuss each in turn.

¶ 49    First, Tamara contends that the trial court "abdicated its role as the independent trier of fact regarding the minor children's best interests." Because the court agreed with the GAL's recommendations, Tamara claims the court failed to act as an independent trier of fact. We summarily reject Tamara's contention. The court considered not only the GAL's recommendations, but also all the evidence presented at trial. Contrary to Tamara's argument, we commend the trial court for its unquestionable patience throughout the proceedings—including the 12-day trial. In our view, the trial court made a careful, detailed, and fair determination in its written judgment. Standing alone, it is not error for the trial court to agree with the GAL's ultimate recommendations.

¶ 50    Next, the Tamara claims that the trial court should not have relied upon the GAL's report and testimony in determining the allocation. Tamara claims the GAL acted as an advocate for "Geoff (and, by extension, his 'teammates' [A.W.] and [G.W.])." Tamara believes that the GAL unfairly and critically assessed her, whereas Geoff only received a favorable assessment. We find the record belies Tamara's argument.

¶ 51    Here, the GAL met with the children (together and individually) several times, met with Geoff and Tamara individually and together approximately 14 times, and visited the home 3 times. She also conducted telephone interviews with Tamara's counselors Kris Munson and Sister Linda Sevik, Tamara's sister, the parties' marital counselor, the parties' neighbor, and the director of student services at the children's school. The GAL also reviewed several video recordings, the parties' OFW communications, all pleadings, and the children's educational documents and updates. Based on this investigation, the GAL created a report, which we find consisted of a thorough and fair assessment of both parties and the children's best interests. Accordingly, we find no bias on the part of the GAL.

¶ 52        Despite this, Tamara claims the GAL's testimony and report demonstrate bias. In support, Tamara cites several facts which she claims demonstrate the GAL's bias. We disagree.

¶ 53        First, some instances of bias are based on Tamara's mischaracterization of the evidence. For example, Tamara claims that the GAL criticized her for failing to seek "trauma treatment." Tamara points to the fact that she participated in therapy sessions with Sister Linda Sevik and Kris Munson. Tamara's claim is flawed because the GAL's reference was to Tamara's decision to terminate therapy with the marriage counselor after the counselor advised her to seek such treatment. In addition, Tamara claims the GAL's unannounced home visit established that she was actively working with Geoff to advocate against her. The GAL contacted Geoff so that she could arrange a timeframe that she would be able to investigate the claim made by A.W. that Tamara failed to provide for their dietary needs. It is reasonable that the GAL would contact Geoff, rather than Tamara, when she investigated allegations against Tamara. Tamara also claims that the GAL failed to investigate the allegations made in Tamara's petition for an order of protection. This assertion is contradicted by the record. Tamara also claims that the GAL failed to consider Geoff's decision to obtain a passport for G.W. and new cellular phones for the children. Geoff informed Tamara of these decisions immediately after they were made. And, Geoff obtained new cell phones as Tamara disabled their existing service.

¶ 54        Second, Tamara's claims the GAL was biased because she incorrectly noted that Tamara, rather than Geoff, brought N.W. to her office when N.W. "crumbled" in front of her. It is insignificant who brought N.W. to the GAL's office.

¶ 55        Third, Tamara claims that the GAL's report was flawed and biased because the GAL failed to investigate other claims further. Tamara cites to several instances that required the GAL to investigate further. For example, Tamara believes the GAL should have interviewed the neighbors

further to investigate the minors' claim that Tamara spoke ill of them to other family members and neighbors. Tamara also believed that the GAL should have questioned her regarding the video recorded altercation in which she swore at her children and threatened to hit another child with a pool stick. In addition, Tamara believes that the GAL should have sought the advice of G.W.'s counselors or doctors to determine whether G.W. should have taken a summer course online or in person. Finally, Tamara claims that the GAL only spent two hours reviewing the parties' messages through the OFW system.

¶ 56 Contrary to Tamara's claim, the GAL is only required to investigate the facts of each case, including interviewing the children and the parents, and to provide testimony or a report to the trial court. 750 ILCS 5/506 (West 2016). The GAL is not required to investigate every possible witness. Many of the facts that the GAL needed were obtained through other means; it was unnecessary for the GAL to expand her investigation. We find the GAL went above and beyond in obtaining the necessary information to make her recommendation.

¶ 57 Fourth, Tamara claims the GAL was biased because she failed to afford sufficient weight to her allegations of sexual abuse against Geoff. The GAL investigated this allegation and noted that these claims were irrelevant and that there was no other factual support for her claim. The fact that she did not find Tamara's allegations credible does not demonstrate that the GAL was biased. Consequently, we reject Tamara's contentions that the GAL failed to provide an unbiased report.

¶ 58 While the above is sufficient to dispose of Tamara's argument, we note that while not labeled as such, Tamara's argument is an attack on the credibility of the GAL. A trial court's parenting time and decision-making determination is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004); *In re Marriage of Radae*,

- 13 -

208 Ill. App. 3d 1027, 1029 (1991). The trial court's factual findings will not be disturbed on appeal unless they are against the manifest weight of the evidence or constitute a clear abuse of discretion. *In re Marriage of Seitzinger*, 333 Ill. App. 3d 103, 108 (2002). Tamara had the opportunity to—and did—raise all these purported defects at trial. She thoroughly cross-examined the GAL as well as Geoff. She also presented her own evidence to contradict the GAL's report. The trial court, as the trier of fact, had the superior position to judge the credibility of the witnesses. The court found the GAL credible and Tamara not credible. None of the above points render the trial court's decision contrary to the manifest weight of the evidence.

¶ 59        Next, Tamara argues, "[d]isregarding [the GAL's] report, the evidence clearly demonstrates that the allocation judgment is contrary to the children's best interests." Tamara's argument is nothing more than a request for this court to review the weight of the evidence. "It is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). We decline Tamara's invitation to reweigh the evidence.

¶ 60        Tamara's final challenge to the trial court's allocation judgment is that the court erred when it denied her emergency motion to appoint a custody evaluator pursuant to section 604.10(b) and (c) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/604.10(b), (c) (West 2018)). Tamara concedes that she failed to satisfy the timeliness requirements for presenting a custody evaluator. To be clear, we note that Tamara concedes that her *motion* was untimely. However, the timeliness requirement refers to presenting the evaluator's report to the court. That report must be provided to the court 60 days prior to the allocation hearing. *Id*. The motion to appoint the evaluator is distinct. Thus, not only did she untimely make the request for an evaluator,

she never presented an evaluator's report within the 60-day timeframe. Tamara knew of the facts well before trial. The fact Tamara withdrew her first request to have an additional evaluation due to her belief that the parties would reach an allocation agreement does not change the result. The negotiations broke down nearly a year before trial. The only reason Tamara sought a custody evaluator is based solely on her dissatisfaction with the GAL's findings. As discussed above, we find no error with the GAL's assessment of the case. Neither the collapse of the allocation negotiations nor the GAL's report prevented Tamara from seeking and obtaining an evaluation within the required timeframe. Therefore, the trial court did not abuse its discretion when it denied Tamara's eleventh-hour request to appoint a custody evaluator.

¶ 61                          B. Contribution Petition

¶ 62      Finally, Tamara contends that the trial court erred when it denied her petition for contribution of attorney fees. A party's petition for contribution to attorney fees and costs "*shall* be filed no later than 14 days after the closing of proofs *** or within such other period as the court orders." (Emphasis added.) (750 ILCS 5/503(j)(1) (West 2018). Tamara filed her petition more than 14 days after the close of proofs. As Tamara correctly notes, the time for filing the petition is mandatory. Therefore, the petition was untimely. Although Tamara suggests that the parties waived the 14-day requirement, we find no such waiver occurred. Even if the parties waived this requirement, the waiver effectively came after the 14-day period had already expired. Tamara's argument is also fundamentally flawed as Tamara never presented any valid excuse for her delay in filing her petition. In fact, Tamara did not even seem to be aware of the timing requirement. We find no abuse of discretion.

¶ 63                              III. CONCLUSION

¶ 64      For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

- 15 -

¶ 65        Affirmed.